Good morning. Mike Andrea. I represent Avista Corporation. I'm also arguing on behalf of the other investor-owned utility petitioners, which are Puget Sound Energy, Portland General Electric Company, Idaho Power, and Pacificor. I'm going to be sharing my 20 minutes with counsel for Grays Harbor. So if I could have 10 minutes, I would appreciate that. Would the clerk please run it 10 and 10? Is that right? Thank you. Thanks. I'm going to address two issues today. The first is the ripeness issues raised by Bonneville and the Public Power Council, PPC. Our issues are ripe, and I will address that. The second issue that I'm going to address today is whether BPA's allocation of environmental attributes solely to the preference customers at no additional cost was lawful. And it's the investor-owned utilities. I missed something. Are you the investor-owned utilities, or are you Grays Harbors? Thank you, Your Honor, for that clarification. We are the investor-owned utilities. Thanks. The issues that Grays Harbors and Grays are entirely separate from our issues, and I won't be making any comments on those issues. On the ripeness issue, there is absolutely a final action here. Bonneville is contractually committed to convey environmental attributes solely to preference customers. That is a final action. I couldn't hear. I'm sorry, Your Honor. There is a final action here. Bonneville is contractually committed to convey environmental attributes solely to the preference customers, and that is a final action for which this Court has jurisdiction and for which a 90-day statute of limitations attaches. Okay. Can I just stop you there for a moment? What you said when I read your briefing, I said, well, that has intuitive appeal. But when I look at this, one of the CECB Johnsons in the 1986 case, which looked at a contract between BPA and a customer, which contractually committed the BPA to limiting a rate charge, we said, not right. We need to wait and see, let BPA exercise its discretion during rate making. I found it very difficult to distinguish our decision in that case from the situation here. Can you help me on that? Yes, Your Honor. Thank you. Johnson was a very different case. In that case, they did set some criteria for how Bonneville would set a rate under Section 7F of the Northwest Power Act. But it was a dormant provision, and Bonneville did not expect, and expressly represented to the Court, that it did not expect to implement that provision. This is very different. Bonneville has contractually committed to convey environmental attributes to one classification of customers, in this case the preference customers. That will happen. There is nothing speculative about that. It is a done deal, so to speak. But then in Exhibit H it goes on to say, but we'll fix the rates after the fact. Yes, Your Honor. But respectfully, that is merely a very speculative potential for a remedy in the future. Bonneville has not determined that it has the rate making authority that is reserved there. PPC has made it clear that they're uncertain about that authority in their brief. And moreover, even if they have authority, they have not contractually committed to use that authority. As a result, it's very important that we have the opportunity to challenge the conveyance. If we don't challenge the conveyance now, after that rate making authority, we will not have the opportunity to do that. But getting back to CEC Johnson, isn't in that case, EPA was also contractually committed to affecting the rate in a certain way, and we said we don't care, we want to wait and see how the rate making plays out? Yes, Your Honor. But again, they have not set a rate. It was very analogous. I was struck during the last argument. It was a very similar situation as to what was at issue in the TRM proceeding that you just heard. Bonneville contractually committed to some criteria for setting rates, but they did not set the rates, and those rates were open to being challenged after they were later set. And you're saying that by agreeing to convey these environmental credits to one class of customers at no additional charges, in words to that effect, that in effect is setting a rate for those customers? Is that your argument? Yes, Your Honor. It is setting a rate because it is an attribute that is associated with the power, and Bonneville is contractually committed to give those away at no additional cost in addition to the power. So, in effect, they've set a zero rate for those environmental attributes. What's really important, I think, on the right, Pete, can the rate setting procedure decide that some contract that the utility entered into, the Bonneville Power Administration utility entered into, it shouldn't have, and therefore its rate of return should be lower or some cost associated with the contract should not be included in the rate base? My thinking is it really is no skin off your nose that Bonneville Power Administration and some other customer makes one deal or another, except insofar as that deal affects your rate, and the way it affects your rate is if the deal with a different customer reduces their return, then they have to increase the return that they get from you. They have to get more money from you if they're getting less from somebody else after all the credits. And I'm wondering if a credit should not have been given to some other customer, can you then be saved from the adverse impact of the credit that should not have been given to the other customer in the rate setting procedure by a challenge to what's in the rate base, something of that nature? There's a lot in there, so let me try and unpack that. First of all, with regard to the contract, if we don't challenge it now, we won't be able to challenge it later, and it's not going to be- As long as you pay the same amount that you would have if they had not made the contract. Right. And so with regard to whether or not we can be made whole later, which I think is really your question- Yes. We don't know. We don't know. It's our position that Bonneville has authority. However, we also know that every time that Bonneville exercises rate-making authority, especially new rate-making authority like that at issue here, it's going to be challenged. And we don't know if that's going to withstand challenge. And if we don't succeed in a challenge to the rate-making authority, we will have lost the opportunity to challenge the conveyance, which is the unlawful act. Let's assume that even if they just decided to hand over $10 million to the Ford Foundation as a charitable gift, that they would try to include it in the rate base and make you pay the $10 million. Let's just assume that and that they'd go kicking and screaming all the way through all the courts they could before they would take a reduction in their rate of return on account of giving away $10 million. Nevertheless, could you get the rate of return reduced so that their having wasted $10 million didn't hurt you? It's not clear. That would be decided through a rate-making process. I'm not sure whether they would have authority to do that or not. That decision would be absolutely challenged. What I really want to do is make sure that I reserve a little time for rebuttal. But one thing I really want to make clear for the Court is that the way that Bonneville and PPC have framed our issue in the rightness argument is not correct. Our challenge as to the final action is to the contractual conveyance of environmental attributes solely to the preference customers. That final action is unlawful under Section 7 of the Northwest Power Act and the APA. Are you saying the equitable allocation? Or why is it unlawful specifically? It's unlawful because they did not allocate all the same costs and benefits to both the PF preference rate and the PF exchange rate required by the cost allocation provision and did not provide an equitable allocation of a benefit of a resource for which we both pay all of the costs on. Let me ask you this because you're saying, well, maybe it can be fixed on the back end. We don't know if they have the authority to do it. I was trying to understand how it could be fixed on the back end through the rate-making process if they've contracted to, without breaching the contract, since they've said we'll charge you the same, no extra charge, we give you these free. I think you've hit the issue exactly. We don't know that they can do that. If the Court does decide to delay a decision of this case until after that time, we would respectfully ask that the Court expressly make clear the statute of limitations on the contract claims and the claim against the record of decision that the investor-owned utilities brought in this case. The statute of limitations be expressly told so that we retain the ability to challenge that later through doctrine of equitable tolling. And that is really important. And one last point on that. There's always an issue of when that statute of limitations begins to run. Is it after Bonneville completes the rate-making proceeding or is it after FERC approval? And we would ask to avoid unnecessary litigation of the Court and make it clear when that statute of limitations begins to run. I'm going to try and save the rest of my time for rebuttal if I can't make it cancelled. Thank you. Good morning, Your Honor. Kevin Kiley on behalf of PUD Petitioners Grays Harbor and Klatskanai. Congress ordained one system. BPA appears to prefer another. Thus did this Court succinctly summarize a challenge by petitioning PUDs in the PGE versus BPA case to power sales contracts that the BPA entered into with certain investor-owned utilities on grounds that those contracts violated certain provisions of the Northwest Power Act, including Section 5, which is at issue in our case as well. I'm going to try and save the rest of my time for rebuttal if I can't make it cancelled.  I'm going to try and save the rest of my time for rebuttal if I can't make it cancelled. You're not challenging, though, the tiered rate methodology itself. That was what I gleaned from your brief. That's correct, Your Honor. We are not. So you're not objecting. They clearly are changing their – I don't know if it's statutorily mandated, but the traditional way that they charge rates, from the melded to the two tiers. And so you're presented with the contract that's – which you've entered into, and so I'm having trouble understanding why you haven't just waived any of the claims to these additional statutory issues which you've waived in the contract. Our challenge, Your Honor, is not to the tiered rate methodology itself, but to the implementation of that methodology or any other methodology or any other contract which does not comply with the express mandates of Congress in the Northwest Power Act. Okay. So if we start with your challenge to section 12.1, and you were saying that that was a conflict with section 6H of the Act, but that just starts by saying if a customer so requests, the administrator shall grant billing credits. So by signing that contract, you've said, I won't request that. So I was having trouble seeing where there was any direct conflict with the statute. Is there something I'm missing there? The statute, like the statute dealing with the residential exchange program, which is the next section. The 12.2 challenge. Correct. Uh-huh. Also contains the same introductory phrase, indicating that it will apply if a customer requests it. If there's an offer to sell. That's correct. And in the PGE case, the BPA argued, among other things, that the fact that the investor-owned utilities had settled their rights under 5C and 7B of the Northwest Power Act was one of the reasons why those provisions were off the table in the challenge. But the party that was hurt was not a party to the settlement contract. The party that was challenging it were not signatories. So this is a different situation. You're a signatory to this contract. It is different in that sense, Your Honor. Well, that's an important sentence, I think. The problem is the PUDs were presented with a classic Hobson's choice. The choice was to take it or leave it. We signed this contract by December 1 of 2008, and we have nothing in the hopper for you to consider as a realistic alternative. Remember ---- Did you request an alternative? Did you say, we want to ---- we do not want the TRM alternative. We want the melded rate alternative. You've said you'll provide it. That's what we want. Show us the contract. Did you request that? A number of publics, including one of our clients in this case, requested an alternative contract that complied with the law. One was not forthcoming. A melded rate contract? That's right. And that's reflected in the record. And so the request was made and BPA said, well, we don't have one yet. We'll give it to you later on. Is that ---- They had nothing to offer. At times they made comments about coming up with something in the future, but to this day no contract that complies with the law has been offered. So I think, Your Honor, that the situation that the PUDs were faced with was well summarized by the Western Public Agencies Group in comments below that are in the record. And I would like to call this comment to the Court's attention because the BPA in their brief selectively quotes from two lines of it, but they don't leave out the gist of it. It's the same problem Your Honor noted with respect to selective quotation in an earlier case. And this comment is at SER 1365 by WAPAC. They first note in the piece that BPA quotes that what BPA should do here is pursue a voluntary procedure that would encourage people to buy into the tiered rate methodology approach. Then, and this is the part that BPA left out in its brief, WAPAC quotes, however, it is quite a different matter for Bonneville to propose that preference customers must waive a statutory right, such as the right to pursue a legal challenge, in order to receive the power supply to which they are statutorily entitled. It is beyond Bonneville's authority to condition the receipt of one statutory right on the waiver of another statutory right. Suggesting that such a waiver will be required indicates Bonneville's concern over the legal vulnerability of the tiered rate proposal. That's the Hobson's choice my clients faced. That's why all the PUDs signed up. They simply could not afford the risk of being denied their statutory right to preference power, so they signed under protest. That take-it-or-leave-it offer, BPA has admitted in this case and in the record below that the billing credit provisions and the residential exchange program provisions are being sidestepped. At page 45 of the BPA's brief, they say why can't statutory rights be waived? Often statutory rights can be waived. The problem, Your Honor, is that it was illegal for BPA to do it in the first place. Exactly the situation. Why is it illegal? I didn't see that. Because they, in order to, any power sales contract must comply with every provision of the Northwest Power Act. Just like in the PGE. Why can't you waive it? I mean, people waive constitutional rights all the time, like the great run of criminal cases we get, or pleas where somebody waived their constitutional rights at jury trial. Just about all rights are waivable, unless there's some express provision that it's not waivable. Why can't the rights that were waived be waived? Well, I don't think the police, for example, could prospectively ask private citizens to waive their right to unreasonable search and seizure limitation. And in fact, that's what they do. Well, sure. They can consent to a search. Do it every day. That's true. But what this contract did was, this is a continuing attempt by the BPA here, in perspective, to do an end run around the Northwest Power Act. They don't like it. Let's assume that. But still, what law is it that prohibits waiver? Let's assume that BPA is trying to, for purposes of discussion, let's assume that BPA is trying to cheat you out of your statutory rights by putting you in a box where it's to your advantage to waive them, rather than try to insist on all of them in the face of their refusal. Why can't they? Your hypothetical question, Your Honor, assumes a realistic choice. And as we've argued in the briefs ---- How come there's no realistic choice? Well ---- Is there a prohibition on waiver somewhere? If it violates public policy, yes, there is. And granted, they're not dealing with the BPA, but we've cited some cases in our briefs that stand, generally speaking, with that proposition, that if a waiver, for example, the Fair Labor Standards Act, requires payment of the minimum wage. And employers are ---- That's not waivable. I think there's an express provision. Actually, at the time the Supreme Court case was decided, the Act did not say that. The Court so held, however. Because to do this would be to allow BPA, through this same procedure of asking for a waiver, to sidestep the Act. And this Court has already held on numerous or several occasions, I should say, that that's improper. The most recent being the PGE case. And they shouldn't have offered these contracts with these provisions to begin with. Is it possible to buy power from someone else in the region, or are you stuck with whatever BPA ultimately does? Is it theoretically possible? Yes. Theoretically and practically. Well, as a practical matter, the BPA controls all the low-cost power, and it's the foundation stone that access to that preference power. As mandated by Congress ---- There's somebody else that sells electricity, but it's more expensive? Dramatically more so, yes. And Congress recognized that and gives priority preference in the BPA's power to public utility districts. Without that, they wouldn't exist. I'd like to reserve, if I may, my remaining time for rebuttal. Thank you. Thank you, counsel. Good morning again, Your Honors. Dave Adler, Bonneville Power. I plan to argue for 10 minutes this morning and share my time with Mr. Paul Murphy, representing certain of Bonneville's preference customers. Ten and ten? Excuse me? Ten and ten? Actually, ten and then five and five, because I ---- Mr. Courtney Olive, also representing Bonneville, will be responding to the arguments of the IOUs. Mr. Murphy and I will respond. Ten, five and five. Would the clerk please run the clock that way? Thank you, Your Honor. Thank you, counsel. Before getting to the issue of the voluntariness of signing the contract, there's one point I really do want to get to. He gets ten. Excuse me? Oh, you're just helping the clerk. One issue I very much would want to get to, because it just turns this case upside down, and that is the suggestion that there's a violation of statutory policy of any sort here. The regional dialogue contracts and the tiered rate methodology were the result of a seven-year massive administrative process, and the result of that, the culmination of it, was the execution of these contracts with 130 preference customers. The benefits as a result of those contracts, and it's an exhaustive detail in the record, it shows that Bonneville is promoting conservation. It's promoting renewable resource development. Pardon me, Mr. Adler. All this is sounding a little bit like a commercial for BPA. Let me ask you this. As I understood Mr. Kiley, he was saying that when you gave him the tier contract, there was no alternative. He had to sign that. It was take it or leave it. He was making an offer he couldn't refuse. I have to respectfully disagree. But why do you disagree with him? Because Bonneville was unequivocal in the administrative record and throughout and in the record of decision on the contracts that if a customer did not want to sign the regional dialogue contracts, it would offer an alternative traditional melded rate contract without the waiver provisions included. Was that ever done? The contracts were not developed or negotiated during the course of the administrative process, but we made that clear that if a customer wanted that, we would negotiate. Did anybody request that kind of alternative? During the course of the administrative process, some of the customers requested that we develop this fallback contract. And as the record demonstrates, during the process, Bonneville and the customers were pretty much stretched to the breaking point with respect to developing the regional dialogue contracts as well as the tiered rate methodology. And the upshot was we could not devote the resources to develop both a fallback contract at that time and the principal contract. So the answer is you never offered a plan B? Well, we did offer a plan B. The plan B was just that we would negotiate the contract, Your Honor. And we extended the offer again in our brief, and we extend it again today. I mean, the situation here is this. Right now, Grace Harbor and Klatschke and I are operating under their existing contract. That doesn't even expire until October 1 of 2012. If they want to negotiate an alternative traditional melded rate contract without the waivers, we could do that tomorrow, and it could be done in 60 days. And that is what I have been advised is the amount of time we're talking. Because the traditional contracts are exactly that. We've done that since Bonneville's inception. It's not going to be, with just two customers, extremely difficult to be able to negotiate those contracts with these parties if they want it. Now, one of the briefs indicates it's actually practically it's not possible because the melded rate is inconsistent with the tiered rate methodology. Obviously, you're melding something that you're splitting apart for every other customer. As a practical matter, is it possible to negotiate, to put into place a melded rate contract for two customers? Yeah, absolutely. And when Bonneville made the representation in the record of decision that it would do that, we fully committed to the fact that if a customer wanted the alternative contract, we would develop the melded rate alternative. Plus, for other reasons involving rate making under the Northwest Power Act, we have to develop a melded rate as well. It wouldn't be the rate that's going to be applied to these particular, that is for the preference customers that take power under Tier 1 and Tier 2, that will be a separate rate. But for purposes of calculating some other rates under the Northwest Power Act, we essentially need to come up with it anyhow. So the answer is it is not a problem to develop the melded rate at all, and it's not problematic to do that and to serve these customers. If they want the contract, we can negotiate the contract, and they can have it without the waivers included. It's really their choice. The next issue I would like to address, if I can, is just the point the Court was getting to before about the nature of statutory waivers, because this is a classic instance where the express language of the statute should really control. As was being indicated earlier, Section 6H1 of the Act says that if a customer so requests, they can obtain billing credits. Section 5C1 of the Act talks about whenever a Pacific Northwest utility offers to sell power to Bonneville, then Bonneville could provide certain benefits. But it's solely within the discretion of the customers to decide or not to decide whether they want to request these benefits. And there's no reason that they should be in a position of being told that they cannot waive those benefits when they were just intended for them. I'd like to turn for a minute to the case of Portland General Electric, if I could, that has been referenced. And it's kind of an effort to try and shoehorn this into that case to some degree. Grace Harbor is alleging that this case is similar to Portland General Electric because Bonneville is substituting a program created by Congress for one created by Bonneville. And Georgia, I'm sorry, Grace Harbor is contending that Bonneville is improperly substituting tiered rates, in effect, for billing credits and residential exchange benefits. The key difference, though, is that in the Portland General Electric case, the underlying action that was being challenged, that was basically the substitute for what was directed by Congress, was allegedly illegal, and the court found that to violate the law. Here there is no allegation whatsoever that there is anything unlawful about tiered rates themselves. They are perfectly lawful. And customers, as well, have the right to waive billing credits and residential exchange benefits. As a result, all that we have going on in this case is Bonneville and its customers choosing to adopt one statutorily permitted method for advancing the purposes of the statute over another statutorily permitted method. That's all. And hopefully, and the record demonstrates, there will be enormous benefits to be gained from it, and they will promote the purposes of the statute. If there are no further questions, I would refer this to Mr. Murphy. Thank you, counsel. Who is 10-5 and 5, Madam Clerk? Good morning, Your Honors, and may it please the Court. I'm addressing the same issue. I represent Collins County PUD, which is one of Bonneville's largest preference customers. I represent the Northwest Requirements Utilities, which is a group of approximately 50 of Bonneville's preference customers. And I represent PNGC Power, which is a group of 16 of Bonneville's preference customers. And all three of those groups were very active in the development of both the tiered rate methodology and the RD contracts, which incorporate the tiered rate methodology. The RD contracts were adopted on October 1, 2008. That was three years before the first power deliveries under those contracts would take place on October 1, 2011, and it's 17 months from today that the first power deliveries will take place. Those RD contracts had two preconditions for a customer accepting the contracts. One, that the customer must waive its right to request future billing credits for generating resources, and, two, it must accept BPA's 2008 average system cost methodology for calculating one facet of the residential exchange transactions applicable to preference customers. Despite Bonneville's repeated offers to negotiate alternative contracts for the customers that either did not want tiered rates or were unwilling to agree to the preconditions, Grays Harbor argues that it was coerced into its RD contract and it should therefore be relieved of compliance with the two preconditions which it accepted. Excuse me, counsel. I'm not at all sure I have this right. One reason I think to avoid any more review than we have to do is that the risk of error is so great on a hypertechnical matter such as this. However, I think a problem that the appellants have is that they think that the cost of some environmental compliance is being shifted so that some customers get the benefits and other customers get the detriments of added expense. And I've been wondering whether there's any relief at a subsequent time for the customers that get the detriments from the cost of the environmental activities. Is there some relief available? Well, we didn't address that particular issue. However, what Avista et al. have challenged is that the environmental attributes of the resources that the preference customers will physically buy and take delivery of were transferred without a separate charge. It's a separate charge. The full cost of those resources would be included in the preference customer's rates. Well, it says without any additional charge. So it's the rate that's offered to everyone except certain customers get the RECs without any additional charge. That means it's not a separate charge. The full cost of the resources with which these RECs are associated is recovered. They don't separate out the charge for the RECs. It's all recovered from the rates, but the people who get the RECs are paying less than the people who don't get the RECs. That's not at all clear. Well, it seemed clear from the contract.  It's not, Your Honor. What the contract does is talks about who gets to get the certificates that there are environmental attributes. Yeah, but BPA offers to monetize them. It says, or we'll sell them and we'll give you the money. That does not in any way preclude Bonneville from properly allocating to the preference or the PF exchange rate the monetary benefits, and that's what the IOUs are complaining about. They're pointing to Section 7G, which is a rate-making standard that says that the benefits, in that case they're talking about monetary benefits. Rates are dollars. That's all they are. And under 7G, the monetary benefits are to be allocated equitably, and Bonneville specifically reserved in its contract with the preference customers the right to do whatever it had to do in rate-making in order not to violate any of the rate-making directives. There is nothing that they've done at the moment that has hurt the IOUs at all. The IOUs are simply concerned that when Bonneville actually goes to set the rates, that they won't abide by that. But that's got nothing to do with the contract with the preference customers. It seems difficult the way the contract was drafted because if, for example, I'm in Los Angeles and if the Department of Water and Power says we'll charge everyone the same rates, but for you people who live in Hollywood, you also get a free car or we'll give you the value of the free car. But don't worry. You people who live in Glendale will figure out some way to do something on the back end. I don't understand. It seems inconsistent. If Bonneville were to go out and sell the environmental attributes in the open market and then later in the rate process take those credits in developing the rates, that's no different than what's happened here. What they're basically said, we will give you the claim to the environmental attributes themselves and indeed we'll monetize it, i.e. assign some dollars to it. But they have not said at all what they're going to do in reflecting those monetary consequences in the rates that are going to be applicable to the IOUs. They just simply haven't done that. They say transfer to customer at no additional charge or premium beyond customer's payment of the otherwise applicable Tier 1 rate. That seems to bind their hands about how they're going to treat the value of those RECs in rate making. I don't see how they can then charge the customers in essence by giving them an additional hike or what. The rate that is referred to there is not applicable to the IOUs who are complaining about that contract provision. There's nothing in that contract that talks about how the rates set that are applicable to the IOUs. The Tier 1 rate is not applicable to them. So Bonneville has total freedom under the contract. They've carefully embedded into that Exhibit H full ability to properly deal with the rate making standards when it got into the rate case. And nothing in that contract ties Bonneville's hands in any way to prevent them from abiding by those rate making standards. I was kind of hoping to address the issue that my clients had particularly interested in, and that's the Grays Harbor claim. Take one more minute. I just want to point out that, first, Bonneville was very clear that if any customer wanted a new contract, they had to sign the R.D. contract once they got the R.D. contracts ahead of them. And they needed more advance notice on the R.D. contracts because the customers who signed their R.D. contracts had to commit to either supply their own resources or have Bonneville supply. So there was a choice that had to be made, and there's lead time that's necessary. Under the conventional contract, you don't need all that lead time. That's why Bonneville got the R.D. contracts behind it. Now, Mr. Kiley argues that somehow it would be inappropriate for Grays Harbor or Klatske and I to make the waivers that it did in fact waive. And they cite primarily the Brooklyn Savings Bank case, which was also cited by the United States Supreme Court in New York v. Hill, pointing out that the qualifier in the Brooklyn Savings case is that if such waiver or release contravenes statutory policy is the very important qualifier. And they went on to say it is not true that any private right that also benefits society cannot be waived. They – Grays Harbor has not shown how there's anything about the substitution of tiered rates, a rate methodology that is permitted under Section 7E of the Act, and was specifically designed to further conservation in the development of renewable resources, how that in any way conflicts with any policy under the Act. Thank you, counsel. Thank you, Your Honor. Counsel, please proceed. May it please the Court, my name is Courtney Olive on behalf of Bonneville Power Administration, and I will be responding to the issues that the investor-owned utilities raised regarding environmental attributes. First, on the ripeness issue in Judge Akuta's questions on California Energy Commission v. Johnson, the case is absolutely on point. Mr. Andrea has noted that, well, it's not really on point because in that case, Bonneville said that it wasn't likely to implement one of the contract provisions there. Well, there were four contract provisions there. Yes, that was true of one of those provisions. But of the other provisions, the Court found that they simply weren't ripe, and the parties there, in fact, were even claiming that they violated the same statutory provisions that the IOUs currently claim, Section 7G and 7F of the Northwest Power Act. And yet the Court still found Bonneville hasn't set these rates, it hasn't made its cost allocation decisions, so clearly this issue is not right. What happens if the contracts to give some of the customers benefit of these environmental credits and other customers not subsequently is deemed inequitable? Anything you can do about it so that the customers who paid for other people doing nice things for the environment don't get left holding the bag? So the thing about this is the IOUs suggest and seem to say that they have some entitlement to these environmental attributes. They simply don't. So the IOUs suggest that they have some entitlement to these environmental attributes. But to me, it's not entitlement exactly. It's just as though they're missing out on something. If you make me pay you to give charity to John Doe, it's good for John Doe, and you're indifferent because I paid you what you gave him, but I get left holding the bag. And I think that's my problem. The thing here, though, is it seems as though the Court's impression may be that Bonneville has some obligation to maximize revenues. And when we give away something ---- I recall with electric utilities, what you get is you have a rate base, and your rates are set so that you get a return on that rate base. And if you give away money or credit so that other people don't have to pay you as much money, you're going to make up for it with the rates you're allowed to charge. Well, that's ---- Your Honor is correct in terms of normal electric utilities. Bonneville is not such an entity. We're a federal power-marketing administration, so we are not trying to maximize revenue and give from one or take from one in order to give to another. You can give money to Peter without Paul having to pay? It depends on the statutory factors at play.  Because that's the argument that they're making. Yes, it is. And I think it's a misnomer to say these are environmental credits. I mean, they're basically just an item of value that are salable on the market, so they have some monetary value associated with them. So you're essentially giving a rebate or a credit or something to certain customers, and the argument, as I understand it, is that violates your obligation to equitably allocate the rates. So all that the equitable allocation gives the IOUs is it directs how we calculate their subsidy, their residential exchange program subsidy. Right. Okay? So, first of all, we're not there yet, and when we set rates, then we will do that equitable allocation. We've said so. We've reserved that right in the contract, as you all discussed with Mr. Murphy. But that's supposed to be the same. Isn't that supposed to be the same rate as what you charge to the preference customers? No. No. It starts off, it's called a PF rate, but there are two. There is a PF preference rate and a PF exchange rate, and they can be different, most certainly. So, now, the bases for those rates are the same to some extent, but the PF preference rate contains certain protections that the exchange rate does not get the benefit of. So it's not a pure equitable allocation in that sense. I think what I would say here is that that still doesn't give the IOUs an argument here because this is just a contractual commitment to convey these attributes. It doesn't tie our hands, and it doesn't affect how we can perform those calculations later in the rate case and how we can determine how best to comply with that Section 7G equitable allocation directive. And there's nothing arbitrary about this either. Bonneville went through and it stated its rational basis for why it's conveying these attributes along with the power, bundled as a feature of that power. It's just part of what you're paying for, preference customers, when you pay that otherwise applicable Tier 1 rate. We just didn't carve it out separately, and we didn't charge a separate extra premium for it. I'm out of time. Thank you. I just would like to make two really quick points with the time I have. First, Johnson is absolutely not on point. This is not, as the respondents have characterized it, merely a rate-making challenge. This is a challenge of an actual conveyance of environmental attributes to the preference customers, which is unlawful under Section 7B1 and Section 7G of the Northwest Power Act. That action is done, and it is reviewable. Second, I want to thank Mr. Olive for representing that Bonneville will equitably allocate some environmental attributes to the IOUs in the future. We appreciate that, and we certainly hope that's true. The fact is, however, it is not yet clear whether or not Bonneville's hands are actually tied. Mr. Olive says that they are not. I am certain that several of the preference customers will argue that they, in fact, are. The bottom line is the ability of Bonneville to provide that remedy is extremely speculative, will be subject to challenge, and we need the ability to challenge the conveyance. Otherwise, our hands will clearly be tied, or there is a strong possibility that the hands will be tied. Thank you, Your Honor. You don't really need to challenge the conveyance, do you, as long as it doesn't hurt you economically, as long as it winds up that you don't get left paying for their credits? Your Honor, if we had the time to wait and see whether or not in the rate-making proceeding Bonneville is actually able to make us whole with the remedy, we may well not need to challenge. However, because of the statute of limitations on the final action and the fact that that final action may tie their hands in that next rate-making proceeding, we need the ability to challenge the conveyance. And so that's why we ask, first, that the Court find that it is right and address the merits now, but if the Court finds that it's not and decides to wait until after that rate-making, we respectfully request and urge the Court to find the statute of limitations as told on those claims under doctrine of equitable tolling or otherwise, so that the IOUs are not denied their day in court on that issue and denied due process. Thank you, counsel. Thank you. In the 40 seconds I have left, Your Honors, unless the Court has any further questions for me, I would only say this, that if Bonneville is serious about the ex post facto offer that it's made and it's briefed, it is not contained in the record below, then they should have no serious quibble with a remand from this Court back to BPA.  I'm sorry, Your Honor, I'm not sure what the substance of the ex post facto offer is. Well, that's a very good question, Your Honor. I don't know. All I know is what's in the footnote that BPA put in its brief. And in that footnote, they said, oh, yes, we are prepared to offer you a contract that, in essence, complies with the provisions of the Northwest Power Act, if that's what you want. But to this day, they have never done so. That's a melded rate contract. Correct. Well, I don't know exactly what it is. You heard Mr. Adler explain that there's plenty of time that can be done in 60 days. Well, they've been making noise along those lines for some time now, and they have never presented one. I'm suggesting that if the Court agrees with us that these contracts violated the Northwest Power Act to begin with and did do what the Court, this Court did in both PGE and Snohomish, which is to remand back to BPA for further proceedings consistent with the Court's opinion, the Court then expressing no prior judgment about the underlying validity of the contracts. It gave BPA several options. That's what this Court did in those cases. How would we remand? I don't understand what the district court would do. It seems like there would be nothing for them to do. The remand would be back to BPA, Your Honor. While you negotiate. In the Snohomish case, that's the best example I can give, Your Honor. The Court granted the PUD's petition declaring that certain provisions of these settlement agreement sales contracts and offense amendments to them violated the Northwest Power Act because they didn't account for them. It's the same argument we're making here. The Court declared that those provisions were illegal, and then it said, in an opinion by Judge Bybee, I believe it was, that it was going to be remanded back to the BPA, and the BPA had a number of choices available to it. One would be to say, okay, all the contracts are illegal, and so we're going to start over. Another would be to just excise those or come up with some other alternative. The deal is illegal. It's remanded for negotiation. That's one option. Yes. Thank you, Your Honors. Thank you, Counsel. A VISTA Corporation v. BPA is submitted, and we're adjourned for the morning.
judges: Kleinfeld, Bea, Ikuta